| NOT FOR PUBLICATION |
|---|

**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**

**13-54**

**STATE OF LOUISIANA**

**VERSUS**

**KELVIN MOSES**

************

**APPEAL FROM THE**
**SIXTEENTH JUDICIAL DISTRICT COURT**
**PARISH OF IBERIA, NO. 12-65**
**HONORABLE EDWARD M. LEONARD, JUDGE**

************

**J. DAVID PAINTER**
**JUDGE**

************

Court composed of J. David Painter, Shannon J. Gremillion, and Phyllis M. Keaty, Judges.

**AFFIRMED.**

**J. Phil Haney**
**District Attorney**
**Angela B. Odinet**
**Assistant District Attorney**
**415 Main Street**
**St. Martinville, LA 70582**
**COUNSEL FOR APPELLEE:**
        **State of Louisiana**

**Edward J. Marquet**
**Louisiana Appellate Project**
**P.O. Box 53733**
**Lafayette, LA 70505**
**COUNSEL FOR DEFENDANT-APPELLANT:**
        **Kelvin Moses**

**Kelvin Moses**
**Pro Se**
**D.W.C.C.-H3A**
**6370 Bell Hill Rd.**
**Homer, LA 71040**

**PAINTER, Judge.**

Defendant, Kelvin Moses, appeals his conviction for molestation of a juvenile. For the following reasons, we affirm.

## FACTS

N.M., a fourteen year old boy, accused Defendant, his great uncle, of raping him while he was at Defendant's apartment.

Defendant was charged with molestation of a juvenile, a violation of La.R.S. 14:81.2, by bill of information filed on January 12, 2012. Defendant entered a plea of not guilty on January 27, 2012. Trial by jury started on May 7, 2012, and the following day, the jury found Defendant guilty as charged. On June 19, 2012, Defendant was sentenced to fifteen years at hard labor. A motion for appeal was filed on July 11, 2012, and was subsequently granted.

## DISCUSSION

*Error Patent Review*

All appeals are reviewed for errors patent on the face of the record, pursuant to La.Code Crim.P. art. 920. After reviewing the record, we find an error patent. However, the error is harmless.

The bill of information charged Defendant with molestation of a juvenile in violation of La.R.S. 14:81.2(A)(1) and (B)(2). At the time of the commission of the offense, La.R.S. 14:81.2 did not contain subparagraphs (A)(1) or (B)(2). Those provisions were added with the rewriting of La.R.S. 14:81.2 during the 2011 legislative session. *See* 2011 La. Acts. No. 67 § 1. The pertinent provisions at the time of the commission of the offense were La.R.S. 14:81.2(A) and (C). However, the erroneous citation of a statute in the charging instrument is harmless error as long as the error does not mislead the defendant to his prejudice. La.Code Crim.P.

1

art. 464. Defendant does not allege any prejudice because of the erroneous citation. Therefore, any error is harmless.

*Failure to Establish an Element of the Crime*

On appeal, Defendant asserts that the State failed to establish an element of the crime, i.e., control or supervision. Defendant argues that he was not in a position of control or supervision over the juvenile.

> The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La.7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La.2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La.10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847, 850 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La.10/16/95), 661 So.2d 442.

*State v. Teno*, 12-357, p. 7 (La.App. 3 Cir. 11/7/12), 101 So.3d 1068, 1073.

Defendant was convicted of molestation of a juvenile, which is:

> the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile.

La.R.S. 14:81.2(A)(1).

Detective Cassie Duhon testified at trial that she investigated a call regarding Defendant on April 25, 2011. At that time, she went to Iberia Medical Center to interview the victim, N.M., then thirteen years old. N.M. informed her that he had been raped by Defendant at Defendant's apartment.

2

Clair Guidry, an employee of the Acadiana Crime Lab, testified that seminal fluid was identified and blood was detected on the rectal swab taken from N.M. A mixed DNA profile was found on the rectal swab. The major contributor of DNA was N.M., and the minor contributor was Defendant. Guidry testified that the probability of selecting an unrelated individual at random having the same partial minor DNA profile found on the swab was approximately one in 1.2 billion.

Detective Annette Derise also interviewed N.M. at Iberia Medical Center on April 25, 2011. N.M. told Detective Derise that Defendant picked him up and was supposed to bring him to his aunt's house. Defendant told N.M. that his aunt was not at home, so they went to Defendant's apartment. While there, N.M. took a bath and then laid on the sofa. While N.M. was on the sofa, Defendant started fondling between N.M.'s legs with his foot. N.M. then moved to another sofa, where he dozed off while watching television. N.M. told Detective Derise that Defendant picked him up, took him to the bedroom, threw him on the bed, made him perform oral sex, then rolled him over and penetrated him anally. Detective Derise testified that N.M. reported the events to a friend, Terrika Joseph. Joseph then reported the events to Tawana Vital Lecrox, who reported the events to N.M.'s mother. N.M.'s mother subsequently called Defendant, who denied that the events occurred.

Detective Derise testified that she interviewed Defendant on September 8, 2011, and that he denied that the events described by N.M. took place. He did, however, admit that he picked N.M. up and that N.M. was at his apartment. He denied that N.M. was supposed to sleep at an aunt's house. Defendant said that he tried to make N.M. do his homework and that N.M. did not want to. Defendant then fell asleep on the sofa, and N.M. woke Defendant up to bring him home.

N.M. was fourteen years old at the time of trial, with a date of birth of October 15, 1997. N.M. testified that during Easter of 2011, Defendant, his great-

uncle, raped him. N.M. testified that Defendant was going to bring him to his Aunt Kelly's house, but Defendant drove to his apartment instead. N.M. testified that while at Defendant's apartment, Defendant told him to take a bath, and he did. Defendant subsequently asked N.M. if he had cleaned his private areas. After the bath, N.M. laid down on the sofa, wearing Defendant's shirt and a pair of his own boxers. N.M. testified that he started falling asleep, and Defendant touched him between the legs with his foot. Defendant then picked him up and brought him to the bedroom. Defendant carried him like a baby, laid him on the bed, and got on top of him. Defendant took off his clothes and raped him. N.M. testified that he told Defendant to get off him. When asked if he hit Defendant, N.M. testified, "No, because I never wanted anybody to put their hands on me[,] and I was really scared cause [sic] I could of [sic] got, he could of [sic] actually murdered me or something like that." Defendant did not have a weapon during the incident. After the incident, N.M. returned home. N.M. testified that Defendant told him, "this is going to be our little secret."

N.M. testified that Defendant visited his mother at their home. He spent the night at Defendant's apartment once, but Defendant was not home.

Terrika Joseph testified that during Easter of 2011, N.M. called her between 10:00 and 11:00 p.m. crying. N.M. told her he was "played with." Joseph went to see N.M., and N.M. stated that his uncle had "played with" him. Joseph attempted to get N.M. to explain what he meant. She questioned N.M., asking, "did somebody stick something, you know," and N.M. said, "yes." Joseph then told N.M. that he needed to talk to his mother. Joseph testified that N.M. was nervous, crying, and pacing. She called N.M.'s nanny, who came over. Defendant later went to N.M.'s home. Joseph testified that N.M. was a "little bipolar."

4

Nicole Collins, N.M.'s mother, testified that she was at her daughter's house on the night in question, and N.M. returned after 9:00 or 10:00 p.m. Collins was asked if she gave Defendant permission to pick up N.M., and she stated: "Well he came to get him to sleep over and I said it was okay that he can [sic] go, but I was assuming that he was going to my Aunt Kelly [sic] house." Lecrox was the first person who told Collins what happened to N.M. Collins testified that N.M. was hesitant to talk to her about the incident. She then decided to bring him to the hospital.

Collins testified that N.M. did not have any homework on the evening in question, and she had never asked Defendant to assist with N.M.'s homework. Additionally, she had never asked Defendant to speak with N.M. about anything going on in his life or be a mentor to him. To Collins's knowledge, N.M. had never spent any one-on-one time with Defendant. However, Defendant had spent time with N.M. when he visited their home.

Collins indicated that N.M. had been diagnosed with ADHD but had not taken medication for the condition in two years. Additionally, he had never been diagnosed as bipolar. Collins was shown medical records that indicated that she stated N.M. had ADHD and was bipolar.

Defendant testified that Collins was his niece and that he visited her and N.M. at their home. Defendant stated that N.M. spent the night at his house three times, twice with his aunt and a third time during Easter of 2011. Defendant testified that, on the date in question, Collins called around 10:00 p.m. and requested that N.M. stay at his house. He picked up N.M. a little after 10:00 p.m. Defendant testified that Collins said N.M. was cutting up at school, and she needed something to be done with him. Defendant thought Collins wanted him to get N.M. to "do his work. Have him to do right in school instead of cutting up." Defendant

had previously spoken with N.M. about his behavior in school. However, he had never helped N.M. with his homework before. Defendant testified that he was asked to help N.M. the week before the night in question.

Defendant testified that once at his apartment, he told N.M. to take a bath and then do his homework. Defendant testified that N.M. said he was not going to do the work. While N.M. was sitting at a table in the dining area, Defendant dozed off on the sofa. N.M. subsequently woke Defendant and said that he wanted to go home. Defendant indicated that he brought N.M. home shortly after 11:00 p.m. Collins opened the door of the house for N.M. Ten to fifteen minutes later, Collins called him and said that N.M. told her that Defendant raped him. He then told Collins that he was coming over. By the time he returned to Collins's house, Collins and N.M. had gone to the hospital.

Defendant testified that he had sex with adults and used condoms and that the previously used condoms were placed on the side of his bed or thrown in the trash can, which included the trash can in the bathroom where N.M. showered. Defendant took his trash out when the cans were full. Defendant testified that he lived alone. Defendant denied assaulting N.M. On cross-examination, Defendant was asked, "Is it your testimony that [N.M.] because he didn't want to do homework took a used rubber and put your semen up his rectum." Defendant responded, "I guess, I'm not sure."

Kelly Davis testified that Defendant was her brother and that Collins was her niece. She testified that she was introduced to N.M. after the allegations at issue arose. Davis stated that N.M. was not supposed to spend the night at her house on the night in question and that he had never been to her house.

Defendant argues that N.M.'s testimony demonstrates the lack of force, violence, duress, menace, psychological intimidation, or threat of great bodily

6

harm and that he was not questioned by the State regarding any such acts. N.M. testified that he merely told Defendant to "get off me."

Defendant also argues that there was no evidence of influence by virtue of a position of control or supervision over N.M. Defendant asserts that Collins testified that Defendant did not live with her, was never a mentor to N.M., she never called upon Defendant to talk with N.M. about any aspect of his life, N.M. never slept over at Defendant's house, and the two never spent any one-on-one time together. Collins gave Defendant permission to transport N.M. to his Aunt Kelly's house for the night. Additionally, N.M. testified that Defendant was to bring him to his Aunt Kelly's house. N.M. did not see Defendant a lot, speak with or interact with him, never spent the night with Defendant, and his homework was not Defendant's concern.

Defendant argues that neither Collins nor N.M. directly testified that he had authority or control over N.M. Defendant contends that the jurisprudence requires the State to establish that N.M. was entrusted to Defendant's custody and that he had decision-making authority over N.M. In support of his position, Defendant cites several cases in which a defendant was found not to have supervision and control. However, in each of those cases, the alleged conduct occurred when other adults were present in the house and/or when there was testimony that the defendant was at the house in a capacity which did not include supervision and control. *State v. Forbes*, 97-1839 (La.App. 1 Cir. 6/29/98), 716 So.2d 424, *State v. Rideaux*, 05-446 (La.App. 3 Cir. 11/02/05), 916 So.2d 488. *See also State v. Teague*, 04-1132, p. 9 (La.App. 3 Cir. 2/2/05), 893 So.2d 198.

To the contrary Defendant herein was the only adult present at the time of the alleged conduct. Defendant testified that Collins called around 10:00 p.m. and requested that N.M. stay at his house. N.M. testified that Defendant was going to

7

bring him to his Aunt Kelly's house. However, Defendant drove N.M. to his apartment. Collins testified that Defendant picked up N.M. for a sleepover, which she said was okay but that she assumed that Defendant was bringing N.M. to his Aunt Kelly's house. Regardless of the scenario, Defendant was alone with N.M, and N.M. was under his supervision and control while he was either transported to Aunt Kelly's house or visiting Defendant's apartment.

Because Defendant was the only adult present, and Collins allowed N.M. to leave home with Defendant, Defendant had supervision and control over N.M. *See State v. A.B.M.*, 10-648 (La.App. 3 Cir. 12/8/10), 52 So.3d 1021, *State v. Johnson*, 10-547 (La.App. 3 Cir. 12/8/10), ___ So.3d___ and *State v. Strother*, 43,363 (La.App. 2 Cir. 8/20/08), 990 So.2d 130, *writ denied*, 08-2289 (La. 5/15/09), 8 So.3d 580. Therefore, we find that the State proved the elements of molestation of a juvenile beyond a reasonable doubt.

*Inflammatory Comments*

In his first pro se assignment of error, Defendant contends that the prosecution committed error when it commented upon a statement made by one of its witnesses about Defendant.

At the conclusion of the State's rebuttal closing argument, the prosecutor stated: "You heard one of the witness's say she [was] happy he didn't rape her kids. I'm glad for that, I just wish he wouldn't of [sic] raped this one."

Defendant contends that the State's comments violated La.Code Crim.P. art. 770, because it was a comment upon another crime not in evidence and/or the comment was so inflammatory as to be a violation of the provisions of La.Code

Crim.P. art. 771.[1] Defendant then asserts that, because of this inflammatory comment, his conviction should be reversed.

However, Defendant failed to contemporaneously object to the remarks at issue. Accordingly, Defendant did not preserve this claim for appellate review. La.Code Crim.P. art. 841. Therefore, we will not consider this assignment of error.

*Unanimous Verdict Instruction*

In his second pro se assignment of error, Defendant asserts that the trial court violated Article I § 17 of the Louisiana Constitution of 1974 by advising the jury that its verdict must be unanimous.

When instructing the jury, the trial court stated: "Your verdict must be unanimous. All must agree. When all of you agree upon the same verdict, whatever it might be, you may render it. Unless all of you agree on a verdict, no verdict can be returned."

Defendant argues that although the jurors were not allowed to rehear or review evidence, their concerns were expressed through an attempt to either support guilt and/or render a reduced verdict. Defendant states that, nevertheless, the trial court's action in cautioning the jurors that the verdict must be unanimous indirectly forced jurors to relinquish whatever doubt they may have had in exchange for a unanimous finding of guilt.

Defendant did not object to the trial court's jury instruction. Therefore, this claim was not preserved for appellate review. La.Code Crim.P. art. 841. However, this court will review this claim because Defendant's assertion that the jury instructions were erroneous is incorrect.

At the time of the commission of the offense, La.R.S. 14:81.2(C) provided:

---

[1]Article 770 governs mandatory mistrials, and article 771 governs the use of admonishments.

9

Whoever commits the crime of molestation of a juvenile, when the victim is thirteen years of age or older but has not yet attained the age of seventeen, and when the offender has control or supervision over the juvenile, shall be fined not more than ten thousand dollars, or imprisoned, with or without hard labor, for not less than five nor more than twenty years, or both the defendant shall not be eligible to have his conviction set aside or his prosecution dismissed in accordance with Code of Criminal Procedure Article 893.

"Cases in which the punishment may be confinement at hard labor shall be tried by a jury composed of six jurors, all of whom must concur to render a verdict." La.Code Crim.P. art. 782(A).

The charge at issue was triable by a jury of six, all of whom had to concur to render a verdict. La.R.S. 14:81.2; La.Code Crim.P. art. 782(A). Hence, the trial court's instructions to the jury were correct.

## CONCLUSION

For these reasons, Defendant's conviction is affirmed.

**AFFIRMED.**